# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

CHRISTINE A. ROBERTS,

      Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social
Security[1],

      Defendant.

**No. 05-CV-4081**

**ORDER**

_____

This case involves an application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., and Supplemental Security Income benefits ("SSI") based on disability under Title XVI of the Act, 42 U.S.C. §§1381 et seq.  Plaintiff, Christine A. Roberts, (hereinafter "Roberts"), filed this action requesting reversal of the Commissioner's decision that she is not disabled.  After careful consideration of the parties' written and oral arguments, the Court reverses the decision of the ALJ and awards benefits as of May 21, 2004.

---

[1] This case was filed originally against Jo Anne B. Barnhart, who was at that time Commissioner of the Social Security Administration ("SSA").  On February 12, 2007, Michael J. Astrue became Commissioner of the SSA, and he hereby is substituted as the defendant in this action.  See Fed. R. Civ. P. 25(d)(1).

## I. INTRODUCTION

On May 28, 2003, Christine A. Roberts ("Roberts") applied for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., and supplemental security income benefits ("SSI") based on disability under Title XVI of the Act, 42 U.S.C. §§1381 et seq. Tr. 16. Ms. Roberts' alleged disability onset date is December 31, 2002. Tr. 16.

## II. BACKGROUND

Ms. Roberts is a 45 year-old woman with a twelfth grade education. Tr. 17. She worked in the past as a cashier, laborer, and customer service representative. Tr. 17. She alleges she is disabled and unable to work because of the pain and symptoms associated with diabetes, depression, hernias, and leg problems. Tr. 17. Specifically, Ms. Roberts alleges she suffers from (1) Major depressive disorder, (2) Dependent personality disorder, (3) Generalized anxiety disorder, (4) Residuals of multiple hernias and surgical repairs, small bowel obstructions and lysis of adhesions procedures[2], (5)

---

[2] The process of cutting scar tissue within the body to restore normal function or appearance.

2

Diabetes mellitus II, (6) Thrombophlebitis[3] right leg with chronic venous insufficiency, (7)Hypertension, and (8) Obesity.  Docket 10, at 2-3.

In July 1998, Ms. Roberts had an exploratory laparoscopy[4] with release of small bowel obstruction, lysis of adhesions and repair of an incisional hernia.  Tr. 216.  Past medical history indicated she has undergone surgery for a cholecystectomy[5], an appendectomy[6], two hernias, and ectopic pregnancy[7].  Tr. 216.

Throughout 1999, Ms. Roberts was seen in the emergency room for a toothache, cellulitis in her lower legs, and diabetes mellitus.  Tr. 228-43.  In March of 2000, she saw Dr. Folchert complaining of being under a lot of stress caused mainly by caring for her sick mother.  Tr. 286.  In August,

_____

[3]  Venus inflammation with thrombus (blood clot) formation.

[4]  Examination of the contents of the  thin membrane that lines the abdominal and pelvic cavities with a laparoscope passed through the abdominal wall.

[5]  Surgical removal of the gallbladder.

[6]  Surgical removal of the appendix.

[7]  A pregnancy occurring elsewhere than in the cavity of the uterus.

3

following the passing of her mother, Ms. Roberts spoke to Dr. Folchert again indicating she was feeling depressed and not coping well. Tr. 285. Dr. Folchert recommended speaking to a psychiatrist and getting involved in a bereavement program. Tr. 285.

On April 16, 2001, Ms. Roberts had a psychiatric medical evaluation by Judy Buss, ARNP. Ms. Buss noted that Ms. Roberts has been prescribed anti-depressants by Dr. Folchert, however, due to financial problems, has not been taking them. Tr. 260. Also, Ms. Buss noted Ms. Roberts had not been taking care of her diabetes. Tr. 260. Ms. Buss diagnosed Ms. Roberts with Major Depressive Disorder, recurrent moderate without psychotic features, Dependant Personality Disorder, and Non-Insulin Dependant Diabetes Melitis. Tr. 261. Ms. Buss noted Ms. Roberts is suffering from legal problems, loss of mother, no job, and financial stress. Tr. 261. Her GAF was 40. Tr. 260.

From May through October, Ms. Roberts continued to see Ms. Buss. Tr. 249-258. Throughout these visits, Ms. Buss opined Ms. Roberts' depression was moderate. In June 2002, Ms. Roberts had a follow-up appointment on her Major

4

Depressive Disorder, methamphetamine abuse, and Dependent Personality Traits. Tr. 248. At this time, she was taking Celexa[8], Buspar[9], and Seroquel[10], and recently quit taking Wellbutrin[11] because it was giving her the "shakes." Tr. 248.

On March 28, 2002, Ms. Roberts was seen in a follow up by Ms. Buss. Tr. 249. Before seeing Ms. Buss, Ms. Roberts had spent 51 days in jail for a probation violation and also had gotten back into methamphetamine abuse. Tr. 249. This probation violation appears to be from forgery and theft second degree. Tr. 441. At this time, she was awaiting placement at Synergy Center in Cherokee. Tr. 249.

On May 15, 2002, Cindy Ellefson-Martz, BSAH, ACADC, Intake Clinician for Jackson Recovery Center, performed a

---

[8] An antidepressant that is a member of the family of drugs known as selective serotonin reuptake inhibitors (SSRIs).

[9] An anti-anxiety medication for the management of anxiety disorders or the short-term relief of the symptoms of anxiety.

[10] An oral anti-psychotic drug used for treating schizophrenia and bipolar disorder.

[11] An antidepressant medication used to treat major depressive disorder and seasonal affective disorder.

substance abuse assessment. Tr. 271-273. Ms. Roberts reported methamphetamine use since the age 29, daily intravenous use for the past two years. Tr. 271. She claims her last use was three months ago, when she was arrested. Tr. 271. Ms. Roberts identified depression and noted that she did see someone at Siouxland Mental Health; however, due to her drug use and missed appointments, she claims she is barred from Siouxland Mental Health at this time. Tr. 272. During this time, Ms. Roberts has been living at Shesler Hall. Tr. 272.

Two weeks later, on May 28, Ms. Roberts went to the Mercy Medical Center emergency room complaining of abdominal pain. Tr. 275. She was diagnosed with gastroenteritis[12]. Tr. 276.

In June and July, Ms. Roberts continued to see Ms. Buss. Tr. 303-04. On June 28, Ms. Roberts reported she got a job at Best Western Hotel as a housekeeper. Tr. 304. Apparently, Ms. Roberts made only $455.10 in 2002, presumably from this job as a housekeeper. Tr. 126.

---

[12] Inflammation of the mucus membrane of both stomach and intestine.

6

On July 19, 2002, Ms. Roberts was seen for abdominal pain. Tr. 295. On August 6, 2002, Ms. Buss saw Ms. Roberts because Ms. Roberts was not eating or sleeping well. Tr. 302. In December, Ms. Roberts had a psychiatric medical evaluation with Dr. Ronald Brinck which indicated a history of depression and methamphetamine addiction. Tr. 299. She is diagnosed with Major Depressive Disorder, recurrent and a current GAF of 50. Tr. 300.

On January 13, 2002, Dee Right, Ph.D., completed a Psychiatric Review Technique Form ("PRTF") in which she noted that Ms. Roberts had moderate depression. Tr. 305-318. She noted that Ms. Roberts suffered from depressive syndrome characterized by sleep disturbance, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking. Tr. 308. Dr. Wright also completed a Mental Residual Functional Capacity Assessment ("MRFCA"). Tr. 319-24. She opined in her notes that the evidence in her file would support moderate cognitive restrictions of function and moderate restrictions of function with social interaction. Tr. 323.

7

Two days later, Chrystalla Daly, D.O., completed a Physical Residual Capacity Assessment. Tr. 325-330. In Ms. Daly's opinion, Ms. Roberts could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for a total of 6 hours in an 8-hour workday, sit for about 6 hours and push and/or pull with the only limitations being her lifting limitations. Tr. 326. She also noted that Ms. Roberts had no manipulative, visual, communicative, or environmental limitations. Tr. 327-29.

Ms. Roberts continued to see Ms. Buss and Gary Lewis, a licensed independent social worker and therapist, in the spring of 2003. Tr. 266-271. On May 19, 2003, Ms. Roberts was admitted to Mercy Medical Center from the 19th to the 27th for treatment of abdominal wall cellulitis, an abscess cavity, upper midline incision and hematoma in her lower right abdominal wall. Tr. 344-55, 421-22.

On June 30, Mr. Roberts saw Mr. Lewis, who noted that Ms. Roberts wanted to talk about her anxiety and fears and her more severe depression. Tr. 364. She continued to see him throughout the summer, and Mr. Lewis opined that Ms. Roberts

8

was making progress. Tr. 407. In fact, Ms. Roberts had approximately 16 counseling sessions with Mr. Lewis.

On August 6, John Tedesco, Ph.D., completed a PRTF in which he noted that Ms. Roberts suffered from depressive syndrome characterized by sleep disturbance, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking. Tr. 384-97. Dr. Tedesco also completed an MRFCA in which he opined that Ms. Roberts had no more than moderate limitations in any mental activity. Tr. 398-402.

On August 7, 2003, J.D. Wilson, M.D., completed a Physical Residual Functional Capacity Assessment. Tr. 410-418. He opined that Ms. Roberts could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for a total of 6 hours in an 8-hour workday, sit for about 6 hours and push and/or pull with the only limitations being her lifting limitations. Tr. 411. Dr. Wilson also noted that Ms. Roberts had no manipulative, visual, communicative, or environmental limitations. Tr. 412-415.

On October 8, 2003, Alina Budu, M.D., examined Ms. Roberts who complained of being "more depressed and anxious."

9

Tr. 437.  Ms. Roberts stated that her depression increased since her mother's death.  Tr. 437.  She also stated that her depression comes and goes, but that it has been worsening since July.  Tr. 437.

On December 3, 2003, Ms. Roberts saw Mr. Lewis and reported she was struggling with acute depression and anxiety daily.  Tr. 434.  Mr. Lewis noted that Ms. Roberts could not work in public due to chronic anxiety and paranoid feelings.  Tr. 434.  Mr. Lewis also noted his impression that Ms. Roberts "struggles a day at a time."  Tr. 434.

On January 23, 2004, Dr. Budu met with Ms. Roberts who stated she was feeling better.  Tr. 428.  Dr. Budu noted Ms. Roberts was diagnosed with severe major depressive disorder with psychotic features in partial remission, dysthymia[13], double depression, methamphetamine and cannabis dependance in early partial remission, generalized anxiety disorder,

_____

[13] A chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness.

10

borderline personality disorder, and antisocial personality traits. Tr. 428.

Ms. Roberts continued to see Mr. Lewis and Dr. Budu weekly in February and March. Tr. 459-63. During the appointment on March 5th, Ms. Roberts stated that she was being "evacuated" from the shelter she was staying at because of some "mistake" she had made. Tr. 463. Dr. Budu noted she was extremely depressed and upset. Tr. 463. Also, Dr. Budu opined that Ms. Roberts was having difficulty handling severe stressors in her life. Tr. 463.

Ms. Roberts saw Mr. Lewis on March 29, with the goal of "getting back on track." Tr. 470. Ms. Roberts had missed the last two sessions with Mr. Lewis and an appointment with Dr. Budu. Tr. 467-69. She also admitted to recently smoking marijuana, twice, but was hoping to get back into the shelter. Tr. 470.

On May 21, 2004, Mr. Lewis completed a Medical Source Statement in which he "X"-ed on a checklist that Ms. Roberts had "poor/none" in relation to "mental abilities critical for performing unskilled work" in "ability to work in coordination with or in proximity to others without being (unduly)

11

distracted by them"; and also, "poor/none" in "ability to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes." Tr. 476-77. Mr. Lewis noted that "Patient struggles with ongoing problems of depression, anxiety, social phobias--struggles with recovery from drug abuse." Tr. 477. Mr. Lewis also indicated that Ms. Roberts' symptoms or signs included anhedonia[14], appetite disturbance with change of weight, sleep disturbance, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking. Tr. 478. Also, Mr. Lewis noted Ms. Roberts' behavior included persistent disturbances of mood or affect and passivity, or aggressivity; or intense and unstable interpersonal relationship and impulsive and damaging behavior. Tr. 478. Finally, Mr. Lewis commented in the same Medical Source Statement that Ms. Roberts has "marked" severity in restrictions of daily living, difficulties in maintaining social functioning, deficiencies of concentration, persistence or pace, and past episodes of deterioration or decompensation. Tr. 479.

---

[14]Absence of pleasure from the performance of acts that would ordinarily be pleasurable.

12

### III.    ADMINISTRATIVE LAW HEARING

Ms. Roberts testified at her hearing on May 19, 2004, that she is 45, graduated from high school and completed a nine-week period of bookkeeping at Western Iowa Tech. Tr. 32, 37. She also testified that her weight is around 220, but that it has fluctuated between 180 and 260. Tr. 37. Ms. Roberts also testified that she was currently living at Schlitzer Hall, an establishment for mentally challenged women, and before that she was in a shelter and homeless. Tr. 44.

Ms. Roberts testified that the last time she has had a job was in 1999. Tr. 28. She testified that she has had a variety of cashier jobs, mainly in various gas stations/service stations. Tr. 39-40. She testified that her application is dated December 31, 2002, because that is when she started going to Siouxland Mental Health. Tr. 40.

When asked about her physical impairments, Ms. Roberts testified that she has diabetes and her diabetes is affecting her ability to do things. Tr. 41. She testified that she is unable to stand because her legs and feet swell and that her eyesight is deteriorating. Tr. 41. She also stated that

13

because of blood clots, her doctors have told her to elevate her feet two or three times a day, and elevate them higher than her head.  Tr. 42-43.  Ms. Roberts testified as of the time of the hearing that she follows her doctors directions and currently elevates her feet over half of the day.  Tr. 44.  She also said that the doctors told her not to lift anything over five pounds because of her hernia.  Tr. 43.

She testified more about her hernia--how she cannot lift otherwise it will pull out further and also that she is supposed to wear a belly band to hold it in place.  Tr. 45.

Ms. Roberts next testified about her medication.  Tr. 46. She stated that she takes two pills for her diabetes, and that Siouxland Mental Health dispenses the pills to her.  Tr. 46. She testified that the more depressed she got, the more Klonopin[15] she would take.  Tr. 47.  She testified that methamphetamine was her drug of choice, but that she had been clean for about a year and three months.  Tr. 48.  The day of her testimony was May 19, 2004, so she said she has been clean since March, 2003.  She claims that her mental symptoms, her

---

[15] An anti-anxiety medication used for the short term relief of the symptoms of anxiety.

14

depression, has not gone away since she stopped using drugs. Tr. 48. Instead, Ms. Roberts claims it was her mental problems that led her to drugs. Tr. 48. When she does not take her medication, Ms. Roberts claims she just sits in a corner and cries, or she just goes "weeks at a time not wanting to get out of bed and bathe or whatever." Tr. 49.

Ms. Roberts testified that Siouxland Mental Health provided her with a therapist, a psychiatrist, and she was going to group therapy sessions there. Tr. 49. Also, Ms. Roberts testified that she still has symptoms of depression after a year a half of medication. Tr. 49.

Ms. Roberts testified that she has trouble reading books because she needs stronger glasses because of her diabetes, but also because she has a very short attention span and cannot understand what she has read in the first place. Tr. 51. She also testified about what she did in a normal day. Tr. 51. She stated that she sleeps half the day. Tr. 51.

She also testified that she has "jobs" she performs around the residence where she stays, Shesler Hall. Tr. 51. She testified that these "jobs" are not complicated jobs--she gave the example of cleaning a bathroom. Tr. 51. However,

15

she testified that she would not be able to do these "jobs" without someone guiding her, even after completing them several times. Tr. 51.

Ms. Roberts next testified about her physical problems. First, she testified that she could only sit in a chair for an hour and then her lower back would start hurting and feet swelling. Tr. 53. She testified that she would then have to lie down and put her feet up for three hours. Tr. 54. She also testified that she can walk for about five minutes and then she would have to sit down. Tr. 54-55. She testified that if she had to walk farther than five minutes, then her "feet starting paining bad" and she gets shortness of breath. Tr. 56.

Ms. Roberts also testified that she has lower back pain that prevents her from picking things up off the floor. Tr. 56. Also, her hernia stops her from bending over or crouching, stooping, and kneeling. Tr. 56. She also testified that pain from her hernia area prevents her from vacuuming and sweeping. Tr. 56.

The ALJ then asked Ms. Roberts some questions. She testified to the ALJ that she was limited to lifting five

pounds. Tr. 59. She testified that she would have anxiety attacks if she felt pressure or stress. Tr. 60. The ALJ also asked her about her day. Ms. Roberts testified that she had to lay down after most meals or after doing her chores because her medication made her tired. Tr. 61.

Finally, Elizabeth Albrecht, a vocational expert, testified. When given certain work limits by the ALJ, she testified that Ms. Roberts could perform the jobs of final assembler, touch-up screener, and addresser. Tr. 68.

Ms. Albrecht, after reviewing Ms. Roberts' file, testified as to hypothetical questions posed by the ALJ. Tr. 67-70. The ALJ first asked if the following individual could perform any jobs she had previously performed personally if she was:

> . . . 45 years old. She was 43 years old as of the alleged onset date of disability. She's a female with a high school education...she has the following impairments. She is status post multiple incision hernia repairs, small bowel obstructions and biases [phonetic] of adhesion procedures. She has hypertension, insulin dependent diabetes mellitus, obesity. A history of thrombophlebitis [see fn. 1] of the lower extremities with chronic venous insufficiency. Major depressive disorder, personality trait disorder and substance abuse. And as a

17

result of a combination of those impairments and medications or other treatment prescribed for those impairments she has the residual functional capacity as follows. She cannot lift more than 20 pounds. Routinely lift ten pounds. No standing or walking for more than two out of eight hours. With only occasional bending, stooping, squatting, kneeling, crawling, climbing. She is able to do only simple routine repetitive work that does not require constant close attention to detail or use of independent judgment for decision making. She does require occasional supervision. She should not work at more than a regular pace and that's using three speeds of pace being fast, regular and slow. And she should not work at more than a mild to moderate level of stress.

Tr. 67-68

The vocational expert testified that this individual would be able to work as a final assembler, touch-up screener, and addresser. Tr. 68-69.

The ALJ asked Ms. Albrecht another hypothetical question. The ALJ asked if the following individual could perform any jobs she had performed in the past personally if she was:

This individual could not lift more than five pounds. The sitting of no more than an hour at a time. Walking of five to ten minutes. Walking and/or standing is limited to two hours out of an eight hour day with only occasional bending, stooping, squatting, kneeling crawling, or climbing.

18

> Only occasional pushing or pulling. This individual should not work at unprotected heights or around hazardous moving machinery. She is able to do only simple routine repetitive work that does not require close attention to detail. With only occasionally [sic] contact with the public. She requires close supervisor [sic]. By close supervision I mean she needs a supervisor on site, not necessarily looking over her shoulder. She should not work at more than a regular pace or more than a mild level of stress.

Tr. 69.

Ms. Albrecht testified that this individual would be precluded from sedentary work. Tr. 70. Specifically, Ms. Albrecht found the sitting limitation, the lifting, and carrying limitation of five pounds would preclude that individual from sedentary work. Tr. 70.

Mr. Sturgeon, the Plaintiff's representative, asked Ms. Albrecht if there would be any jobs for an individual described exactly as the Judge had in the second hypothetical with the additional limitation that she had to 50% of the time have her feet elevated. Tr. 70. Here, Ms. Albrecht testified that this individual would be precluded from working. Tr. 70-71.

## IV. THE ALJ'S DECISION

First, the ALJ determined that Ms. Roberts has not been engaged in any gainful activity since December 31, 2002, the date Ms. Roberts claims she became unable to work. Tr. 16.

Next, the ALJ noted that Ms. Roberts suffers from status post multiple incisional hernia repairs, small bowel obstructions and lysis of adhesion procedures, hypertension, obesity, diabetes mellitus, depression, and superficial thrombophlebitis in the right lower leg with chronic venous insufficiency, major depressive disorder, personality trait disorder, and substance abuse, but that these ailments do not meet or equal the level of severity required under the social security listings. Tr. 18. Also, the ALJ found Ms. Roberts to be not as impaired as she alleged. Tr. 19. The ALJ gave no weight to the opinion of Gary Lewis, a social worker who completed a "Medical Source Statement" checklist. Tr. 19. The ALJ stated that "the clinical findings reported by this treating source, and those from other treating and examining sources do not support the degree of limitations opined in the checklist form." Tr. 19.

20

Next, the ALJ reviewed Ms. Roberts medical history and, while finding that she has some limitations due to an affective disorder, determined these limitations are largely affected by various life situations and drug use. Tr. 19. The ALJ found Ms. Roberts to have no more than mild limitations in her activities of daily living; social functioning; and concentration, persistence, or pace; and no episodes of decompensation. Tr. 20. Furthermore, the ALJ found that Ms. Roberts was able to lift 20 pounds occasionally and ten pounds routinely[16], no standing or walking for more than two hours a day, and nor more than occasional bending, stopping, squatting, kneeling, crawling, or climbing. Tr. 20. Also, the ALJ found that Ms. Roberts could do no more than simple, routine, and repetitive work not requiring constant, close attention to detail or use of independent judgment requiring occasional supervision and work with no more than a mild to moderate amount of stress. Tr. 20.

The ALJ found that Ms. Roberts could not return to her past relevant work based on the limitations involving walking

_____

[16] This was apparently based on the Physical Residual Functional Capacity Assessment Reports (Tr. 326) completed by non-examining doctors.

and standing.  Tr. 21.  However, based on Ms. Roberts' age, educational background, work experience, and residual functional capacity, the ALJ found there were other jobs Ms. Roberts was able to perform.  Tr. 21.  Specifically, he found she could work as final assembler, production worker, touch up screener, and addresser.  Tr. 21.

**V.   DISCUSSION**

This Court must determine whether the Commissioner's decision to deny disability benefits is "supported by substantial evidence on the record as a whole."  <u>Lorenzen v. Chater</u>, 71 F.3d 316, 318 (8th Cir.1995).

**A.   The Court's Jurisdictional Basis**

In <u>Bowen v. Yuckert</u>, 482 U.S. 137 (1987), the United States Supreme Court delineated the steps which precede a district court's review of a Social Security appeal:

> The initial disability determination is made by a state agency acting under the authority and supervision of the Secretary. 42 U.S.C. § 421(a), 1383b(a); 20 C.F.R. §§ 404.1503, 416.903 (1986).  If the state agency denies the disability claim, the claimant may pursue a three-stage administrative review process.  First, the determination is reconsidered de novo by the state agency. 20 C.F.R. §§ 404.909(a), 416.1409(a).  Second, the claimant is entitled to a hearing before an

22

> administrative law judge (ALJ) within the
> Bureau of Hearings and Appeals of the
> Social Security Administration. 42 U.S.C.
> §§ 405(b)(1), 1383(c)(1) (1982 ed. and
> Supp. III); 20 C.F.R. §§ 404.929, 416.1429,
> 422.201 et seq. (1986). Third, the
> claimant may seek review by the Appeals
> Council. 20 C.F.R. §§ 404.967 et seq.,
> 416.1467 et seq. (1986). Once the claimant
> has exhausted these administrative
> remedies, he may seek review in federal
> district court. 42 U.S.C. §405(g).

Yuckert, 482 U.S. 137, 142, 107 S. Ct. 2287, 2291 96 L. Ed. 2d

119 (1987).

Section 1383(c)(3) of Title 42 of the United States Code

provides, "The final determination of the Secretary after a

hearing . . . shall be subject to judicial review as provided

in section 405(g) of this title. . . ." In pertinent part, 42

U.S.C. § 405(g) provides:

> Any individual, after any final decision of
> the Commissioner of Social Security made
> after a hearing to which he was a party,
> irrespective of the amount in controversy,
> may obtain a review of such decision by a
> civil action . . .brought in the district
> court of the United States for the judicial
> district in which the plaintiff resides...
> The court shall have power to enter, upon
> the pleadings and transcript of the record,
> a judgment affirming, modifying, or
> reversing the decision of the Commissioner
> of Social Security, with or without
> remanding the cause for a rehearing. The
> findings of the Commissioner of Social

23

Security as to any fact, if supported by
substantial evidence, shall be conclusive
. . . . The judgment of the court shall be
final except that it shall be subject to
review in the same manner as a judgment in
other civil actions . . . .

Accordingly, this Court may affirm, reverse or remand the
ALJ's decision.

**B. The Substantial Evidence Standard**

The Eighth Circuit has made clear its standard of review
in Social Security cases. If supported by substantial
evidence in the record as a whole, the Secretary's findings
are conclusive and must be affirmed. Grissom v. Barnhart, 416
F.3d 834, 837 (8th Cir. 2005); Smith v. Shalala, 31 F.3d 715,
717 (8th Cir. 1994) (citing Richardson v. Perales, 402 U.S.
389, 401 (1971); 42 U.S.C. § 405(g) (Supp. 1995)).
"Substantial evidence 'is less than a preponderance, but is
enough that a reasonable mind would find it adequate to
support the Commissioner's conclusion.'" Maresh v. Barnhart,
438 F.3d 897, 898 (8th Cir. 2006) (quoting McKinney v. Apfel,
228 F.3d 860, 863 (8th Cir. 2000)). In the words of the
Supreme Court, substantial evidence is "more than a mere
scintilla. It means such relevant evidence as a reasonable
mind might accept as adequate to support a conclusion."

24

Richardson v. Perales, 402 U.S. 389, 401 (1971) (citing

Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

The Eighth Circuit has taken pains to emphasize that,

"[a] notable difference exists between 'substantial evidence'

and 'substantial evidence on the record as a whole.'" Wilson

v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989) (quoting

Jackson v. Bowen, 873 F.2d 1111, 1113 (8th Cir. 1989)).

> "Substantial evidence" is merely such
> "relevant evidence that a reasonable mind
> might accept as adequate to support a
> conclusion." "Substantial evidence on the
> record as a whole," however, requires a
> more scrutinizing analysis. In the review
> of an administrative decision, "[t]he
> substantiality of evidence must take into
> account whatever in the record fairly
> detracts from its weight." Thus, the court
> must also take into consideration the
> weight of the evidence in the record and
> apply a balancing test to evidence which is
> contradictory.

Id.

The Court, however, does "'not re-weigh the evidence or

review the factual record de novo.'" Roe v. Chater, 92 F.3d

672, 675 (8th Cir. 1996) (quoting Naber v. Shalala, 22 F.3d

186, 188 (8th Cir. 1994)). Likewise, it is not this Court's

task to review the evidence and make an independent decision.

Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996) (citing

25

_Mapes v. Chater_, 82 F.3d 259, 262 (8th Cir. 1996)). "If, after review, [it is] possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [this Court] must affirm the denial of benefits." _Id._ Even in the case where this Court "might have decided the case differently", this Court cannot reverse if there is substantial evidence to support the Commissioner's decision. _Fredrickson v. Barnhart_, 359 F.3d 972, 976 (8th Cir. 2004) (citing _Kroqmeier v. Barnhart_, 294 F.3d 1019, 1022 (8th Cir. 2002)).

The process, however, is not stacked in the Commissioner's favor because, "[t]he standard requires a scrutinizing analysis, not merely a 'rubber stamp' of the [Commissioner]'s action." _Cooper v. Secretary_, 919 F.2d 1317, 1320 (8th Cir. 1990) (citing _Thomas v. Sullivan_, 876 F.2d 666, 669 (8th Cir. 1989)). In cases where the Commissioner's position is not supported by substantial evidence in the record as a whole, the Court must reverse. _See Lannie v. Shalala_, 51 F.3d 160, 164 (8th Cir. 1995). "'[T]he goals of the Secretary and the advocates should be the same:  that deserving claimants who apply for benefits receive justice.'"

26

<u>Battles v. Shalala</u>, 36 F.3d 43, 44 (8th Cir. 1994) (quoting <u>Sears v. Bowen</u>, 840 F.2d 394, 402 (7th Cir. 1988)).

### C. Determination of Disability

Social Security Disability Benefits may be awarded to disabled individuals who meet certain income and resource guidelines. 42 U.S.C.A. § 423 (d)(1)(A). In connection with the award of such benefits to an adult:

> [A]n individual shall be considered to be disabled . . . if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C.A. § 423 (d)(1)(A).

An impairment will only be considered of such severity if the individual is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful activity which exists in the national economy. . . ." 42 U.S.C.A. § 423 (d)(2)(A).

Determination of a claimant's disability involves a five step analysis. 20 C.F.R. § 404.1520 (a-f). In the first step, the ALJ determines if the Claimant had engaged in past

27

substantial gainful activity.  Next, the ALJ decides if the
Claimant has an impairment.  Third, the ALJ must look at the
regulations to determine if the impairment meets or is
medically or functionally equal to a Listing in Appendix 1,
Subpart P of Regulation No. 4.  Fourth, the ALJ assesses the
Claimant's residual functional capacity (RESIDUAL FUNCTIONAL
CAPACITY), to see if the Claimant could perform her past
relevant work.  At the fifth and final step of the analysis,
the Social Security Commission must prove that there are a
significant number of jobs (other than her past relevant work)
in the national economy that a person of the same age,
education, past work experience, and physical and mental
residual functional capacity can perform.  20 C.F.R. §
404.1520 (f).

To acquire Social Security disability benefits, initially
the claimant has the burden of showing 'that [she] is unable
to perform [her] past relevant work.'"  Haley v. Massanari,
258 F.3d 742, 747 (8th Cir. 2001) (quoting Beckley v. Apfel,
152 F.3d 1056, 1059 (8th Cir. 1998)).  This encompasses the
first four steps of the analysis.  "If the claimant carries
[her] burden, 'the burden of proof then shifts to the

Commissioner to demonstrate that the claimant retains the physical residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and with vocational factors such as age, education, and work experience.'" Id. There must be some medical evidence to support the ALJ's determination of the claimant's residual functional capacity, and this evidence should address the claimant's ability to function in the workplace. Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam); Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

**D.  Standard for Reviewing the Alj's Decision**

"Deference to the ALJ's credibility determination is warranted if the determination is supported by good reasons and substantial evidence." Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005). By that same token, the ALJ's credibility determination should not just be stated as a conclusion in the guise of findings, but should be closely and affirmatively linked to substantial evidence. Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995).

Additionally, the law in the Eighth Circuit is well

settled that an ALJ may not discredit a claimant's subjective complaints of pain, discomfort, or other disabling limitations simply because there is a *lack of objective evidence*. <u>See</u> <u>Ramirez v. Barnhart</u>, 292 F.3d 576, 581 (8th Cir. 2002) (noting that the ALJ may not discredit a claimant solely because the objective medical evidence does not fully support the claimant's subjective complaints of pain). Instead, the ALJ may only discredit the subjective complaints if they are inconsistent with the record as a whole. <u>See</u> <u>Dixon v. Barnhart</u>, 353 F.3d 602, 605 (8th Cir. 2003); <u>see also</u> <u>Bishop v. Sullivan</u>, 900 F.2d 1259, 1262 (8th Cir. 1990) (citing <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984)).

Under <u>Polaski</u>, the ALJ must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to:  1) the claimant's daily activities; 2) the duration, frequency and intensity of the pain; 3) precipitating and aggravating factors; 4) dosage, effectiveness and side effects of medication; and 5) functional restrictions. <u>Polaski</u>, 739 F.2d at 1322.  When the

ALJ considers all of the <u>Polaski</u> factors and still makes a determination to reject a claimant's subjective complaints, the ALJ must give "good reasons" for discrediting the claimant's testimony. <u>Hogan v. Apfel</u>, 239 F.3d 958, 962 (8th Cir. 2001). If an ALJ discredits a claimant's testimony and gives good reasons for doing so, the ALJ's decision should normally receive deferential treatment. <u>Id.</u> (quoting <u>Dixon v. Sullivan</u>, 905 F.2d 237, 238 (8th Cir. 1990)).

"As is true in many disability cases, there is no doubt that the claimant is experiencing pain; the real issue is how severe that pain is." <u>Thomas v. Sullivan</u>, 928 F.2d 255, 259 (8th Cir. 1991). "It is well-settled 'that pain can cause disability within the meaning of the Social Security Act.'" <u>Johnson v. §. of Health & Human Servs.</u>, 872 F.2d 810, 812 (8th Cir. 1989) (quoting <u>Northcutt v. Califano</u>, 581 F.2d 164, 166 (8th Cir. 1978)).

**E. Analysis of the ALJ's Decision**

The ALJ was not persuaded that Ms. Roberts is as physically limited as she alleges. Tr. 19. While the ALJ is persuaded that Ms. Roberts has some limitations due to an affective disorder, the ALJ claims these are largely affected

31

by various life situations and drug use.  Tr. 19.

The ALJ found that Ms. Roberts could not perform her past relevant work.  Tr. 21.  However, the ALJ concluded that there are other jobs existing in significant numbers in the national economy that Ms. Roberts was able to perform.  Tr. 21.  Based on the vocational experts testimony, the ALJ found that Ms. Roberts could work as a final assembler, production worker, touch up screener, and addresser.  Tr. 21.

While this Court agrees with the ALJ that Ms. Roberts cannot return to her past work, this Court finds that Ms. Roberts cannot adjust to any other work in the national economy.  This Court is persuaded that the ALJ's <u>Polaski</u> analysis is unsupported by the record.

(A) Daily Activities:

The ALJ found that Ms. Roberts' ability to work was not supported by well documented treatment records or statements of the claimant regarding her daily activities and physical activities.  Furthermore, the ALJ gave little weight to the opinion of Mr. Lewis, stating that "the clinical findings reported by this treating source, and those from other treating and examining sources do not support the degree of

32

limitations opined in the checklist form."

It is well supported that a treating source's opinion is to be given controlling weight if the opinion is well supported by medically accepted clinical and laboratory diagnostic techniques and is consistent with other substantial evidence. 20 C.F.R. § § 404.1527(d)(2). See <u>Hacker v. Barnhart</u>, 459 F.3d 934 (8th Cir. 2006) (Heaney, J. dissenting). Here, the ALJ gave no weight to the testimony of Mr. Lewis because the social worker's conclusions were based upon a "checklist" style form, with inadequate instructions or definitions. This Court is persuaded that the ALJ was incorrect in giving no weight to Mr. Lewis.

Gary Lewis, a licensed independent social worker, conducted roughly 16 counseling sessions with Ms. Roberts. This Court is convinced that Mr. Lewis' opinion should be given the appropriate weight because of the fact that he worked frequently and closely with Ms. Roberts on her medical, mental, and emotional problems. While it is true that Ms. Roberts missed many appointments with Mr. Lewis and other medical staff, this Court is not persuaded, as the defendant argues, that this is because she did not need these

33

treatments, nor as the plaintiff argues, because she was too sick to make these appointments. There is nothing in the record that leads this Court to speculate as to the reasons Ms. Roberts missed her appointments, and this Court will not assume that her reasons for missing appointments were "bad."

Furthermore, this Court finds that Mr. Lewis' Medical Source Statement checklist (the "checklist") (Tr. 476-79), when viewed with the record as a whole, demonstrates Ms. Roberts' ailments are fully supported by Ms. Roberts' medical records. Without fully repeating Mr. Lewis' checklist, under Mental Abilities Critical for Performing Unskilled Work, it states Ms. Roberts has a "poor/none"[17] "ability to work in coordination with or in proximity to others without being (unduly) distracted by them" and the "ability to get along

---

[17] "Poor/None" is defined as "complete loss of ability to perform the named activity in regular, competitive employment and in a sheltered setting; could only do so to meet basic needs at home. "Fair" is defined as "Substantial loss of ability to perform the named activity in regular, competitive employment and, at best, could do so only in a sheltered work setting where special considerations and attention are provided. "Good" is defined as "some loss of ability to perform the named activity, but sill capable of performing it in regular, competitive employment. "Unlimited" (which Ms. Roberts received no checkmarks) is defined as "no loss of ability to perform the named activity." Tr. 476.

34

with co-workers or peers without unduly distracting them or exhibiting behavioral extremes. Tr. 476-77. Furthermore, Mr. Lewis gives Ms. Roberts "good" for her "ability to maintain regular attendance and be punctual within customary tolerances" and the "ability to ask simple questions or request assistance." Tr. 476. All others were "fair." Tr. 476. When asked to explain his assessment, Mr. Lewis stated "Patient struggles with ongoing problems of depression, anxiety, social phobias–struggles with recovery from drug abuse." Tr. 477. Every area of the checklist shows impairment, and this Court finds that this is inconsistent with the ALJ's finding that Ms. Roberts can maintain full-time employment.

The record is replete with reports that fully support Mr. Lewis' conclusions. For example, on December 10, 2002, Dr. Ronald Brinck, psychiatrist, stated that Ms. Roberts was "disheveled with poor hygiene. She shows psychomotor retardation" and diagnosed major depressive disorder, recurrent. Tr. 300. Furthermore, Dr. Alina Budu, psychiatrist, diagnosed major depressive disorder, borderline personality traits, antisocial personality traits, severe

35

stressors, and found a current GAF of 45. Tr. 442. On March 12, 2004, Dr. Budu also noted that Ms. Roberts has a very unstable self image and continues to complain of a very unstable mood. Tr. 465. Dr. Budu also notes that Ms. Roberts recognizes herself in almost every criteria for borderline personality disorder. Id. Therefore, after reviewing the entire record, we find the ALJ failed to give sufficient weight to the opinions of the physicians and social workers who personally examined Ms. Roberts.

Furthermore, the ALJ posed a question to Elizabeth Albrecht, the vocational expert relating to a hypothetical individual. Tr. 67. In this hypothetical question, the ALJ asked Ms. Albrecht to assume she had an individual who, among other limitations, could lift no more than 20 pounds and routinely lift 10 pounds. Tr. 67. Ms. Albrecht replied, in response to this question, that there were jobs that could be performed with these limitations—Ms. Roberts' former job of cashier of self-service gasoline station, and also the unskilled jobs of final assembler, touch up screener, and addresser. Tr. 68-69. This Court is persuaded that the ALJ erred in finding that Ms. Roberts could lift 20 pounds,

therefore, Ms. Albrecht is incorrect in her finding that there were four jobs available for Ms. Roberts.

This Court is left to surmise that the ALJ relied on the Physical Residual Functional Capacity Assessment reports ("PRFCA") of the non-examining and non-treating physicians who submitted reports stating Ms. Roberts could lift 20 pounds occasionally and 10 pounds frequently. Tr. 326, Tr. 411. However, as demonstrated above, there are repeated examples and testimony by Ms. Roberts and others that she is not capable of the physical exertion alleged in these reports. Tr. 56. The ALJ's assertion that these sources' opinions were inconsistent with the record, and therefore should not be afforded controlling or great weight, is not borne out by the record.

(B) Duration, Frequency, and Intensity of Pain:

This Court cannot find any reference by the ALJ to this factor. However, the record is replete with Ms. Roberts seeking medical treatment for hernia repair, cellulitis in the lower legs, foot pain, diabetes mellitus, chronic venous insufficiency, and leukocytosis. The record is also filled with Ms. Roberts requesting and receiving several medications

37

to help with her pain.  This Court is persuaded that this
factor also supports Ms. Roberts' allegations of disabling
pain.

(C) Dosage, Effectiveness, and Side Effects of Medication

Ms. Roberts has tried numerous medications and treatments
to alleviate her pain and depression.  The record shows Ms.
Roberts' medications continually being adjusted to try and
find a combination that was the most effective combination.
Ms. Roberts is taking a large amount of medication; medication
she has stated she is unable to dispense to herself.  Tr. 46.
For example, on April 6, 2004, Ms. Roberts' medication
included Diovan, Actos, Wellbutrin, Seroquel, Buspar, Celexa,
Colace, Tylenol, Ferrous Sulfate, and Prevacid.  Tr. 332.  Ms.
Roberts' medication was adjusted consistently by Dr. Budu in
an attempt to find the most effective combination for Ms.
Roberts.  For example, on August 6, 2003, Dr. Budu states Ms.
Roberts "has taken Lexapro at a high dose for two months and
she is feeling increasingly depressed.  At this point, we
decide [sic] to try another SSRI (selective serotonin reuptake
inhibitor), such as Zoloft...We will increase the Seroquel
...and Ativan."  Tr. 442.  Then, on February 13, 2004, Dr.

38

Budu again adjusted Ms. Roberts' medication, increasing her Effexor and Klonopin. Tr. 459.

Objective medical evidence relating to medications support Ms. Roberts' allegations of disabling pain and depression.

(D) Functional Restrictions

Mr. Lewis opined that Ms. Roberts was not capable of maintaining full time employment. Instead, Mr. Lewis' opinion was that Ms. Roberts' ability to perform unskilled work was limited, at best, to a sheltered work setting where special considerations and attention are provided. Tr. 476. Furthermore, there is ample evidence in the record that shows that Ms. Roberts is not capable of caring for herself, as she moves from shelter to shelter, or at times is rendered homeless. Only with the structure and support of Shesler Hall is Ms. Roberts able to function at a minimum level. This does not speak highly of her ability to perform competitive employment.

## VI. CONCLUSION

After careful review of the administrative record, this Court is persuaded that there is not substantial evidence to

39

support the ALJ's decision, nor does this Court find it necessary to remand the decision for further factual findings. This Court is persuaded that there is substantial evidence on the record that Ms. Roberts' physical and mental problems are so severe as to be disabling and that Ms. Roberts could not return to her past work or other jobs in the national economy.

The Court has carefully considered the arguments of the parties and closely examined the record and is persuaded that there is not substantial evidence in the record as a whole to support the decision of the ALJ. This Court is persuaded that the ALJ erred in discrediting the testimony of the plaintiff, and the ALJ did not appropriately accept the treating physicians' opinions. Furthermore, the ALJ's hypothetical question did not accurately depict Ms. Roberts' impairments and limitations as set out herein on pages 17-19.

This Court understands that the ALJ is to make the credibility findings, but this Court is unable to find solid reasons for the ALJ's refusal to accept Ms. Roberts' testimony regarding pain and depression. On the other hand, this Court was able to find substantial evidence to support Ms. Roberts' allegations of disabling pain and depression, all as set out

40

on pages 32-39 of this Order.

Based on the foregoing, this Court concludes that there is not substantial evidence in the record as a whole to support the ALJ's findings that Ms. Roberts is not disabled. A review of the record as a whole supports the conclusion that Ms. Roberts was, and is, disabled and unable to work as of May 21, 2004.

Remanding this case for further proceedings would only delay Ms. Roberts' receipt of supplemental security income benefits (SSI). Therefore, "an immediate order granting benefits without remand is appropriate." Cline v. Sullivan, 939 F.2d 560, 569 (8th Cir. 1991); Tennant v. Schweiker, 682 F.2d 707, 710 (8th Cir. 1982). Ms. Roberts clearly suffers from pain and depression. She has significant trouble standing, walking, and sitting for any length of time, along with trouble lifting more than 10 pounds. These conditions significantly impair her ability to function in the workplace. Judgment shall be entered reversing the ALJ's decision of denying such benefits.

41

**Upon the foregoing,**

**IT IS HEREBY ORDERED** that the decision of the ALJ is reversed, and the Commissioner is directed to compute and award supplemental security income disability benefits to Ms. Roberts with an onset date of May 21, 2004.

A timely application for attorney fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. §2412 ("EAJA"), must be filed within thirty days of the entry of final judgment in this action. Thus, if this decision is not appealed, and Ms. Roberts' attorney wishes to apply for EAJA fees, she must do so within 30 days of the entry of the final judgment based on the Order in this case.

**IT IS SO ORDERED** this 10th day of July, 2007.

_____
Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa

42